We'll call the last case, Reginald Sanders versus Edward Klem, District Attorney of the County of Philadelphia, et al. Good afternoon, Your Honors. Christopher Warren, I represent Mr. Reginald Sanders. I would like to reserve two minutes for rebuttal, if that would be okay. That request will be granted. Thank you, sir. All right, I have to say at the outset that both my colleague and I feel more prepared than we have ever felt for an oral argument before. Given the letter briefs that the Court has requested, I really don't know what else we can contribute orally to this particular case because I think based on the issues that the Court was concerned about, you guys have pretty much exhausted every factual legal issue that we can think of. So with that in mind, I will point out that I think the first issue before the Court is, and I understand, again, my adversary likes to point out that it's subject to AEDPA, their deferential standards. I have to show that the State Court's application of Bruton, Richardson, and ultimately Gray is the case we are relying upon because it was clearly decided at the time this case was tried that the Superior Court of Pennsylvania either unreasonably applied Gray or that its interpretation and application of the holding in Gray was contrary to what the Supreme Court held in that case. I think we can put this quite plainly. In my brief, I cite, I think it's in footnote 14, page 33, whatever. I talk in there about the way the Pennsylvania appellate courts approach the whole concept of incrimination by inference. They do not believe that that can violate Bruton. I mean, they have flat out said so in the McGlone case and I think the Ma case. And the way they look at this entire legal concept is if the jury has to look at any other piece of evidence to figure out who the unnamed persons are in an out-of-court statement, under no set of circumstances can it ever, ever give rise to a confrontation clause violation. That is how I read the state court's treatment of this issue. And our position is quite plain. We believe that that is an unreasonable application of Gray and we also believe that it's contrary to the holding in Gray. And the court wanted supplemental briefing on the Vasquez case and we did that. And I looked at Vasquez and Vasquez kind of says, well, you can do it one of two ways, okay? It's possible that Bruton may be violated if you look to other evidence and from that other evidence it becomes apparent who the unnamed persons are. But then the court in Vasquez says, you know what, we don't even have to go there because under either interpretation, whether or not the statement on its face incriminates the defendant, because I think the prosecutor in that case during her closing argument actually got up and said the guy's name, caught herself. And so this court said, well, look, we really don't have to determine whether or not looking at other evidence becomes plain who it's referring to here because it violates it under either one. It's my position that I think in Hardwick this court really, really actually adopted the notion that if, if, looking at other evidence, it is obvious, an oversimplistic inference, I believe is parenthetically the way the court interpreted Gray. If the inferences the jury has to draw are oversimplistic, simple, obvious, and they're the type of inferences which literally accuse you of criminal activity, that violates Bruton. Well, if we agree with you that it's a very simple thing for them to fill in the dots under Gray. Right. How about the alternative argument of the government that there's harmless error here, that the evidence is overwhelming, that these guys were just done out for a joyride. They were out to rob someone, and there's plenty of evidence that someone got robbed. Well, Judge, is there really? Okay. It's my position that the only real evidence of robbery here was the out-of-court statement where the girlfriend got up there and said, my boyfriend told me that him and his buddies were out there committing highway robbery. And one of the submissions that the court asked for was, okay, take her statement completely out of the equation, Commonwealth. Come back with specificity and particularity, and you tell us what evidence, what evidence proves that these guys were involved in the conspiracy to commit robbery. Well, the evidence was that a witness, other than Bruton's witness, said that your client was struggling with the decedent and was seen going into his pocket or something. Judge, that witness, the struggling witness was, I believe that was, say, Corporal Eiler. He was an off-duty cop. He was upstairs. I think he was watching the football game or whatever it was. He looks out on the street, and he sees Michael Williams, I believe, has the detective cousins in a bear hug. Walter Grace, another fellow that lives up there, and his testimony, by the way, his testimony, as I point out in one of my letter briefs, is kind of consistent with what my client said, because Grace says he's listening. He hears some shuffling feet, a scuffle. That's what my client said in his statement, that the detective bumped into somebody. They started scuffling. All right, Grace then hears three pops, bang, bang, bang. He looks outside. He sees my client tugging. What he says literally is either tugging at the detective's waistband, maybe his pocket, that's it. All right. That does not prove that at the time the confrontation took place, at the time the shots were fired, it was a robbery. The evidence. Why doesn't it prove that? What's he doing with his hand in his pocket if it's not? Judge, my client had just been shot by this man. He could have been trying to disarm him so he didn't get shot again. Well, if you get shot by someone and you're reacting in self-defense, you don't put your hand in their pocket to try to get something out of their pocket. You would run or, I mean, you don't put your hand in their pocket. Judge, the testimony was not that my client had his hands in his pocket. My client was tugging on the waistband, maybe his pocket. It was really amorphous, really ambiguous. But couldn't a jury, and this is the question here, couldn't a jury reasonably conclude it was a robbery? Without the girlfriend's statement that it was a highway robbery? Look, I'm saying. Then I say no. You say no. I say no. Any competent defense attorney can get up there and convince a jury that that is not proof beyond a reasonable doubt that at the moment that these three guys got out of that car, went into this alleyway, this well-lit alleyway at 1030 with open windows, and that they, someplace they had never been before, had decided to rob this guy. Well, of course, the totality of evidence was that they were, you know, hanging out, so to speak, I'll call it. Here's what had happened. Now, I think this was pretty good because we supplementally briefed this as well. My client and turnip seed were over at, her name was Rashida Elston. I'm going to butcher these pronunciations, but Rashida Elston. They were at her house the night before the shooting. My client leaves his cell phone there. The next night, they decide to go back over to her house to pick up the cell phone. They get, I think they're smoking blunts and, you know, they're doing drugs and drinking all day. They go over there. They get the cell phone, and I think, interestingly, Ms. Elston also said that her house is about six blocks away from Oakland Street. She lives in Frankfurt. The shooting occurred in Frankfurt. Her house is about six blocks away from Oakland Street. Now, admittedly, nobody bothered to ask her, well, how far away is your house from the particular block on Oakland Street where the shooting occurred? That's not in the record. She lived at the 4700 block. I don't know. All we know is she said that Oakland Street was six blocks away from her house. They go there. They get the phone, all right? They are driving back. Now, this is turnip seed's statement.  whatever, all right? For a jury to believe, now, that's Commonwealth evidence. There's no reason to dispute that. The Commonwealth called Don Lanier, Rashida Elston. Yes, they were there the night before. Yes, they came back. Yes, they got the phone. They had a legitimate reason for being there. They were getting the phone. In one of my letter briefs I point out, Elston and Lanier are asked on cross-examination, well, how are these guys behaving? They were laughing. They were joking around. Does not sound, they were not anxious. They were not agitated. They were not nervous. They did not behave, at least from outward appearances, like they were contemplating, hopping in their car, driving six blocks down the road, and grabbing the first human being they saw walking through a well-lit neighborhood on a summer night with a bunch of open windows and doors. I could try this case, okay? And I believe I could convince the jury that tugging on a waistband and maybe playing around with a pocket is not proof beyond a reasonable doubt that those three guys got out of the car, walked in that alley, pursuant to a conspiracy that they had formed to commit a robbery. That's what they charged. And I do not believe tugging, that's what you have, really. Tugging at a waistband and, okay, let's give them the benefit of the inferences. Maybe he had his hand in his pocket, maybe he didn't. I'd say that's really ambiguous, okay? That's it. And from that a jury is supposed to conclude beyond a reasonable doubt that these guys who five minutes earlier had been laughing, clowning around, and joking, got in that car and drove. After smoking and drinking. After smoking, yeah. Smoking and drinking. Smoking and drinking. Let's look at all the facts. Well, that's one of the facts. I agree, I agree. But I don't think that there's evidence of the right. Again, that's one of the things you can look at. But I don't necessarily, well, if that's true, then they should have committed the robbery murder the previous night when they were smoking and drinking with these girls, okay? I don't think that that tips the balance. Can I ask you to change focus a little bit? Sure, sure. Aside from whether there's a brutal violation, if there was an error, was it harmless? Now, we actually have here the Superior Court finding there was no harmless error. Do you want to address that? That there was no? I think they found that the error was harmless on the theory that the evidence was overall. Right, right.  The error was harmless. I like your ruling better, Judge, all right? Sorry. I understand that, Judge, okay? I understand that. Now, the question that I see is to what extent do you have to give that definition, okay? Again, here's what they looked at. Here's what the Superior Court said. It's the same thing the magistrate judge did. The Superior Court said, whoa, we have an eyewitness placing him at the scene. So what? Putting him there does not prove that it was a robbery as opposed to self-defense. We have his admission that he shot Detective Cousins. Again, shooting him does not prove that it was a murder or a robbery as opposed to self-defense. We have eyewitnesses that place him there. Again, the eyewitnesses do not prove that it's a robbery. All right, but in terms of the specific finding of harmless error, how do we review that here? How do you review it? Right. We don't have to defer to that? I got you. I got you. Okay. The standard on constitutional error is Chapman, harmless beyond a reasonable doubt. I read the Superior Court opinion. Guess what I didn't see cited in there? Chapman. Well, it's not required. Okay. Well, that's the standard this Court would have to apply. So it seems to me on that issue you would look at Chapman and you would say, was the Superior Court's determination that the tugging at the waistband or playing around with the pocket, because I think you've got to put all that other stuff aside. And really what it comes down to is the tugging at the waistband, hand of the pocket stuff. Is that fact, that fact alone, and the Superior Court's determination, implicit, that the Bruton error was harmless beyond a reasonable doubt, is that contrary to or an unreasonable application of Chapman? That's analytically how I think you have to look at the issue. Okay. I have one other point. It came to me at 4 o'clock in the morning. You said you didn't have any points. All right. Now, my adversary says that there's no Bruton violation here. If this roughened statement was the very first thing the jury heard, they would be absolutely clueless as to who the three guys were. So I took a look at the prosecutor's opening statement, and this was given on November 12, 1997. And guess what he says. He gets in there and says, you will also hear, this is page 36, you will also hear that the four defendants, my mom, were in Frankfurt on that particular night. None of them live in Frankfurt. He talks where Turnipseed lives and my guy lives in North Philadelphia. And then he goes, they go over to Rashida's house, they get the phone, and he goes, they, pointing at the four defendants, they left that address and they found themselves on the 5300 block of Oakland Street returning from Lifer. Also, as they traveled on Oakland Street was Detective Cousins out minding his own business and power walking in his own neighborhood. You will hear testimony that one of them, that one of the four, one of the four said, I see one. You'll note in my brief, that comes directly out of page 16, Rashida Elson's description of what her boyfriend said. This is his opening statement. And the evidence will show you that the four of them, he's talking specifically about the defendants here, that these four defendants were out on that particular night looking for someone to rob. You will hear testimony that one of them said, I see one, but the car was stopped by defendant Turnipseed and that the other three, Crystal, Sanders, and Williams, got out of the car. Now I think after hearing that, they might have been able to put together who the three guys were that Turnipseed was talking about. I really, in all candor, I really see this as whether or not the standard of Brett versus Abrahamson has been satisfied in this case, whether or not it was a substantial injurious injury, and it really goes to the question you were putting to me, Judge. Is it really overwhelming evidence of guilt? And the final analysis I suggest to you, it really comes down to Walter Grace's testimony. Thank you. Mr. Glieb. Good afternoon, Judge Fischer, Judge Collin, Judge Shigaris. May it please the Court, I'm David Glieb from the Philadelphia District Attorney's Office representing the Commonwealth or the appellees in this habeas appeal. Members of the Court, before I address your questions or make whatever comments I have myself, I'd like to just note for the record my appreciation to Mr. Warren, my opposing counsel, for his consideration and his professionalism in basically handling the case up until now. We were on opposite sides at the district court level. Unfortunately, maybe it was because there were so many defendants here, we had trouble finding the files, the state files in this case. Mr. Warren was just extremely very helpful to me in helping me to reconstruct the file from his own, so I'd just like to note for the record that we do appreciate that. I'd be happy to answer. You concede that there is a brutal violation here. The Court is asking me that. Yeah, well, that's the question before the Court. We don't come quite close to that, no, we don't. You don't concede that. No. In fact, we think there is, that's a good. Explain why there is not, by reason of Rashida or statement. Right. Well, which was read into evidence. Right. I think the Court has to look at that actually in two ways. First of all, because this is an AEDPA case, technically, Bruton isn't even before this Court. What this Court has to look at under AEDPA is one step removed from Bruton. The Court has to look at the Superior Courts, the Pennsylvania Superior Courts determination of a Bruton claim. It rejected the Bruton claim. This Court, removing it one step, essentially says, was that determination of the Pennsylvania Superior Court reasonable or not or consistent with Bruton? Now, I understand in trying to determine that question, obviously you go and look at the Bruton claim itself. Yeah, we would exercise the same standard of review as the Superior Court. I don't think we give the Superior Court any deference. I'd have to disagree with that, Your Honor. Under AEDPA, I think you have to. On a legal question, I have to give them as to whether or not there was a Bruton violation? Absolutely. That's interesting. I never thought of that. Well, under the habeas statute, if the Superior Court determines the issue, determines the constitutional issue, which they do, then under the habeas statute and the Supreme Court's interpretive precedence, this Court is not bound by the Superior Court's decision, but it's bound to look at it with a high degree of deference. I mean, I think that's something I think we've made fairly clear in our briefs. But on the other hand, I think we've also argued it just in the alternative. Even if the Court were to look at it de novo, we still think it doesn't state a Bruton claim. And I think it's good that Mr. Warren brought up the test from Gray. I think the test from Gray, it's Justice Breyer's opinion, wrote that if you take the disputed statement, in this case it's Ruffin's statement, and submit it to the jury as if it were the very first evidence they heard, does it actually pick out this defendant? And unfortunately, Mr. Warren read you the opening statement of the prosecutor, which is not evidence. We're saying that, and I think you can read Gray not to say that you look at all the preliminaries first, then you look at the evidence. No, you don't. The test is do you look at the evidence first, which I invite the Court to do. That's actually why I attach the statement to my red brief, so the Court could read it. Imagine this is the very first evidence that the jury heard and tried to say which one of these persons is being designated here. Most of the references in that statement are to a group. A couple of the references in the statement actually do pick out individuals. Still, there's nothing that says whether the group refers to this group or whether one of those individuals is Sanders. So under Gray, under that thought experiment that Gray gives the Court, we think it's clear, and if the Court just approaches it without giving any deference to the Superior Court, we think it's still clear that there's no root in violation. A couple of questions. Mr. Glieb, it was unclear from the record. The magistrate judge made a finding that this was a redacted statement. But this was, in effect, almost a third-party statement. This was the girlfriend giving the recitation of what Turnipseed gave her, told her, and which our Court and other courts have said is covered by brute, okay? But the question that I'm not clear on is, is the statement in question here actually one that was redacted? I don't think it was. And we have her testimony plus the admission of what she said into evidence. So you've got to consider both of them. Right, right. Although what was her statement didn't go out to the jury. Actually, that's correct, and I specifically look into that in preparing for this case. No, her statement, her physical statement did not go to the jury. Only certain portions were read, and even those portions were not taken out from the statement itself and given to the jury. So the question becomes whether her statement was actually, whether the statement in question was a redacted statement. Your Honor, my understanding, and I looked into the exact same question, my understanding is her statement was read to the jury, and those were her own words. There was never any taking out from those portions that the jury was exposed to. There was never anything that was taken out or X'd out or deleted. Those were all her own words. Was there any evidence that she actually knew these guys, the unnamed guys? I think she implied that, although she also implied that there may have been one or two she didn't know. Okay. You know, we talk about Bruton, and Bruton is really a series of cases. It started with Bruton, and then we had Richardson, and the Supreme Court basically said that because in Richardson the statement was redacted, it wasn't a Bruton violation. That's what Richardson said. It talked about redaction. And then we got to Gray, and in Gray, the government in Gray tried to say, well, wait a minute, Richardson said redacted statements aren't violations. Ours was redacted. But they said, yeah, but then there were some fill-in-the-blanks in Gray, and therefore it isn't covered by Richardson. So we're sending this back. We're, in effect, sending this back to determine whether or not there was linkage. That's really what Gray said. Right. Okay. And it was because the way that the statement, I think in Gray it's key, too, that I think the physical statement actually went to the jury. Correct. So the jury was able to look at it, and they saw either blank spaces or they saw blackened out portions. Now, the question, really the question that you were asked by Judge Cowan, and the answer that you gave, I'm not sure exactly what your answer was, but the real answer is that how we review this is under 2254D1 as to whether or not the Superior Court of Pennsylvania's decision was an unreasonable application of a decision by the Supreme Court. And I take it that counsel for defendant is arguing that Gray is the case in question. I think in his blue brief he focuses on Gray, although you're correct in that the benchmark cases are the three, are Brewton, Gray, and Richardson. But this is really a Gray case. And I guess I would ask you whether or not you think Gray is clear as to what Gray says. Well, Your Honor, that's … Because isn't that really our question, is whether did the Superior Court make a mistake in applying Gray? Well, Your Honor, I'm not sure I would recommend that the court look at Gray by itself, because I think, as you said, Gray is the latest of the Supreme Court cases on this particular Confrontation Clause issue, interpreting Brewton. And I think you'd have to look at all three, but we think it's perfectly consistent with the three. And, in fact, this is the one thing I wanted to call the court's attention to in Gray, is the test that Gray suggests of putting this evidence up front and imagining. I mean, essentially Gray says, despite redaction, despite taking the statement and X-ing out or making blanks, or even using neutral pronouns, despite that, there's enough there, there's enough of an immediate inference just by looking at the statement that it points, inevitably points to one of the defendants. And one of the ways you can test that is, imagine the jury looked at this first. They would be able to determine which defendant we were referring to. Well, looking at it with Brewton, Richardson, and Gray especially, after Dawn's, was it Dawn's testimony? Yeah, Dawn, Dawn's testimony, there was no secret who the other guy was. That connected the dots. You'd have to be a raving idiot not to see who the other guy was. It was Sanders, Saunders. So to say that there's not a Brewton violation here, or a Gray violation, when Dawn puts the finger on this guy as sure as anything. So the only question is, is there an unreasonable application of Brewton and Richardson and Gray? How could you say otherwise than her testimony spells out who the other guy is? And it's not like there are 40 other guys. There's only a few guys. The other guys are easily ruled out. Right. So your position is her testimony does not put this petitioner in the car for the purpose of robbery. Well, Your Honor, when you start looking at all of the other evidence, I mean, when you say her, you're not talking about Yesha Ruffin. No, no. You're talking about somebody else. Dawn connecting the Gray dots. Right, right. But in that case, you get to, essentially, the Supreme Court and this Court on many occasions has held that if the jury has to do that, if it has to go to linkage that does not form an immediate inference, there are all kinds of inferences that the jury can form from looking at a statement. Immediate inferences, which I would say are improper under Brewton, Gray, and Richardson, and non-immediate inferences. I think what Your Honor is talking about is a non-immediate inference of someone's identity. That does not violate Brewton or the Confrontation Clause. You're telling me that under Brewton that if you have a statement that, look, there are three guys that I'm pallorizing. And one of them suggested, for instance, that we robbed someone. But I'm not going to tell you who the three are. And you have a third witness, Dawn, comes in and tells you who the third witness is, that that's not a violation of Brewton? Yeah, that's correct, Your Honor. I couldn't disagree with you more. Because it's... You can't use testimony. Well, Your Honor, it goes back. This Court held that in the Bell case from 1979. How could the defendant cross-examine that type of testimony? What all Dawn is saying is that the third guy is Saunders. Your Honor, it depends on the kinds of inference you're talking about. Again, Your Honor is going beyond the disputed statement. The disputed statement is Ruffin's statement here. So we're looking at other... That identifies a couple of guys, not ten guys, just a couple of guys. Right. And it defines a group. It does, you know, we're admitting it defines a group of three persons. But it doesn't define Sanders in particular. Now, if there's other evidence, as Your Honor is pointing out... Dawn's evidence... ...that points to Sanders... ...points to or identifies Sanders... ...then she can be cross-examined on that. Yeah, but there's no cross-examining the statement that was given that preceded Dawn's identifying Saunders. It's the statement that is incriminating. And the only thing that's missing from the statement is who the third guy is. And yes, Dawn says it's Saunders. But it's the statement that is the proven violation. Dawn is there to be cross-examined. Well, Your Honor, when you look at all of the evidence together... I mean, if the jury was told. In essence, the jury was instructed in several ways in this case. It was instructed under Bruton to consider this statement only as to one of the defendants, Turnipseed. I said nobody else. Forget about the elephant in the jury room. Well, actually, there were two then. There was another elephant because they were also told several times up front and at the end... that they had to look at every single individual defendant and had to look at every charge as to that defendant only. Now, if Your Honor is saying they couldn't really distinguish among the three and they really basically ran together and used evidence for A as evidence against B, I think there's empirical evidence in this case that goes against that. When you look at what the jurors actually found in terms of their verdicts, they separated out these verdicts. They did. They did. But getting back to the ring, Rashida says that there's a robbery going on here. There's a robbery, not a self-defense that happened here. She says that based on what Turnipseed told her. Ruffing. Ruffing, yeah. Right. The only question is who was Saunders' part of that conspiracy to rob? And Dawn says that, yes, he's the third guy. All right. Look, I see your time's up. Just give me a quick rundown of I know you don't concede there's a violation, but if we were to hold that there is a confrontation violation here in violation of Britain, why is that harmless error? Why would it be? Your Honor, we What's so overwhelming that this was a robbery? You didn't need this statement to prove that that was a robbery. Your Honor, I think I tried to focus that in anticipation of this argument in my red brief and also in Well, counsel says there's no evidence except these guys had a bear hug on each other after he got shot. Tugging at his waistband. Right. Unfortunately, Your Honor, I'd have to disagree, although I have the most respect for my colleague here. The two bits of evidence or actually the three bits of evidence that are the most damaging towards Saunders, apart from the statement, apart from Ruffin's statement, is Saunders' statement. He places himself there. He said, I shot the detective, number one. Number two, Dr. Lieberman's statement. And I urge the court to read it carefully because, unfortunately, he did not say that the fatal shot, being shot through the heart, was up to two and a half feet away. He said it was within six inches of his heart. That's inconsistent with a self-defense, which is what they were trying to say. Why is that inconsistent with self-defense? Well, I mean, he said he was running away from him and shooting. Instead, he shot him from within this close. It doesn't seem to me that a person trying to say, I'm defending myself, would shoot a person through the heart within six inches. Of course, it's not absolute proof, but it's something that with his statement, with that, and with the fact that there was good evidence that this detective had a gun on him and he always carried his gun and that nowhere around was there a gun involved, that's evidence of a robbery. You have evidence of a robbery, you have people acting in concert, and you have a killing in the course of it. Therefore, you have the three charges. You have conspiracy, robbery, and second-degree murder. That's the short version of it. But unfortunately, one of the things, one of the submissions from Mr. Warren essentially called the court's attention to the two-and-a-half feet. No, it was two-and-a-half feet. When you look at that testimony very carefully, what he said was, close range in general is from all the way up to the skin or all the way up to the clothes, all the way out to two feet. But in this case, the evidence here, because there were soot marks, means it was about six inches, six inches away. So all of that is evidence that the jury had. All of that is apart from Ruffin's statement. So even if they didn't hear Ruffin's statement, they would have heard that. Of all of those three, if the court wants me to narrow it even further, you have this person there saying, yes, I was there on the night with these people and I shot a person. You have to wonder, why was he there? Why did he end up shooting this person? Well, it was self-defense. Does it really make sense that it's self-defense or that it was a robbery? It doesn't seem to me. One of the things, actually, Mr. Warren pointed out, things occurred to him at 2 o'clock in the morning. Something occurred to me, too, and I never thought I'd say this in a Third Circuit oral argument. You guys are up too late. Let me. I mean, the question. They asked the jury to believe the story that three men went to urinate together. And that occurred to me. I thought, men don't urinate together. We're not going to get into that here. It does not hold up, Your Honor. We're not going to get into that. My time is up. Your time is up. We're trying to save you from yourself here. Thank you. Mr. Warren. Thank you. Do you have anything to add? I shouldn't say you do. Not really. I just wanted to see him dispute that, Your Honor. I wouldn't go near that with anything. Just a couple points. When I read the opening statements, I think it's obvious from the opening statement, Mr. Kleeb says, well, that's not evidence. Well, neither was the prosecutor's closing argument in Vasquez. And this court said that when she got up there and identified the guy, that violated Bruton. So a prosecutor can violate Bruton, and it doesn't have to actually be in evidence. Unreasonable application. My colleague is right. But as I point out in my brief, the state courts, and this court noted this in Vasquez when it said, we all love bright-line rules, okay? And it's really a nice bright-line rule to say as long as you've got to use linkage, it doesn't violate Bruton. But still, in Vasquez, in Richards, Richards was the case where they said, well, my friend in the inside guy, and then they put the defendant's mother up to testify that him and the declarant are a friend. This court found a Bruton violation there, and that was evidence, just like you keep talking about, evidence that was brought in to let the jury know precisely who the friend was. That is where the state courts run afoul of Gray, in my view. By the way, I pulled Ruffin's statement. There is no, I'll represent that to you right now. What appears in the trial transcript was not a redaction. She has it. It's three guys. At an earlier point in her statement, she actually talks about, you know, Royce called her and said he was with Michael, Reg, and I forget who the third one was. She said, I don't really know them, but these are the guys he told me he was with. When it gets to the actual part of the statement that the Commonwealth introduced into evidence, there's no redactions, Judge. They didn't scratch anything else. She just calls them the guys. Yeah, yeah. When what appears in the transcript. So the magistrate judge here, when they found a redaction, was incorrect. I'm afraid that may have came from me. All right. But anyway, yeah, it is not, quote, unquote, redacted in the sense that you were talking about, so I wanted to set the record straight on that. Before you leave this point, the opening statement, is that in the appendix? No, sir. You'll see we've gone on the green. It's in the trial record, okay, but we've gone to the green standard at my office, which means I'm too lazy in all candor to copy it off and stick it on the back. But I will happily submit, if you want me to, I'll submit a supplemental appendix today with the opening statement in there, if that would be easier. Why not, since you made reference to it, why don't you submit that? I certainly will. I will do that this afternoon. I would remind you that there are certain rules that this Court has on appendixes and records to be supplied. Did I just admit it to violate anything? Well, even before you admitted it, I was going to suggest that perhaps you could look a little, both of you could look a little closer at it in the future. I will, sir. I will, sir. And I will take care of that immediately this afternoon. And I have no notes. So unless the Court has any more questions. First of all, we thank counsel. It was an interesting case. It was well argued. Thank you, sir. And we will take the matter under advisement. Okay.